# In the United States Court of Federal Claims

## FOR PUBLICATION

No. 26-204C
(Filed: July 23, 2026)

|  |  |
|---|---|
| **28 TRANS, LLC**, | ) |
| *Plaintiff*, | ) |
| v. | ) |
| **UNITED STATES**, | ) |
| *Defendant*, | ) |
| and | ) |
| **UBER TECHNOLOGIES, INC.**, | ) |
| *Defendant-Intervenor*. | ) |

*J. Larry Stine* (argued), Wimberly, Lawson, Steckel, Schneider & Stine, PC, Atlanta, GA, for plaintiff.  With him on the brief was *Thomas L. Walker*, Wimberly, Lawson, Steckel, Schneider & Stine, PC, Atlanta, GA.

*Kristin E. Olson* (argued), Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.  With her on the briefs were *Brett A. Shumate*, Assistant Attorney General; and *Patricia M. McCarthy*, Director, and *Frankline E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Natica Neely*, Trial Attorney, and *Kate Gorney*, Procurement Counsel, Office of General Counsel–District Contract Law Group, U.S. Department of Veterans Affairs, Washington, DC, Of Counsel.

*Moshe B. Broder* (argued), Jenner & Block LLP, Washington, DC, for defendant-intervenor.  With him on the briefs were *David Robbins*, *Elizabeth M.D. Pullin*, *Jennifer Eve Retener* (argued), and *Megan C. Bodenhamer*, Jenner & Block LLP, Washington, DC.

*William M. Weisberg* (argued), Law Offices of William Weisberg PLLC, McLean, VA, for amici curiae Navarre Corporation and GovTranz LLC.

# OPINION AND ORDER

**BONILLA, *Judge*.**

Over nine million veterans are enrolled in the United States Department of Veterans Affairs' (VA) health care system, and more than six million veterans receive health care services through the VA Veterans Health Administration (VHA)—a nationwide integrated network of medical centers and outpatient clinics.[1]  For many veterans, transportation to and from VHA medical appointments "can be a barrier to care for a variety of reasons, including rurality, lack of access to a vehicle, condition-specific challenges, and the cost of travel. To help veterans overcome these barriers, there are a number of federally supported VA transportation assistance programs."[2]  This combined bid protest and breach of contract action involves the VA's efforts to provide eligible veterans with a patchwork of transportation options under those programs.

28 Trans, LLC, a service-disabled veteran-owned small business, provides nonemergency special-mode ground transportation services to patients of the VA San Francisco Health Care System under a five-year contract with the VA.[3]  Through this action, 28 Trans challenges the VA's public-private collaboration with Uber Health, LLC[4] to transport veterans to and from their medical appointments, also in the San Francisco area.[5]  Specifically, 28 Trans charges that (1) the VA violated a

---

[1] TAMAR B. BRESLAUER & MICHELE L. MALLOY, CONG. RSCH. SERV., R48406, CONNECTING VETERANS AND VETERANS ORGANIZATIONS TO FEDERAL TRANSPORTATION ASSISTANCE 1 (2026); *Veterans Health Administration*, U.S. DEP'T OF VETERANS AFFS. (July 6, 2026), *available at* https://perma.cc/QM75-HQM3.

[2] BRESLAUER & MALLOY, *supra* note 1, at 1.

[3] Certain documents in the record refer to the "San Francisco Veteran Affairs Health Care Center (SFVAHCS)," the "San Francisco Veteran Affairs Health Care System (SFVAHCS)," the San Francisco VA Medical Center (SF[-]VAMC)," and, as noted above, the "VA San Francisco Health Care System (VASFHCS)."  *Compare, e.g.*, ECF 1-3 at 1, *with* ECF 1-4 at 1, *and* ECF 17-2 at 2, *and* ECF 17-1 at 5. The address listed on the performance work statement for 28 Trans' contract, however, refers only to the SFVAHCS.  ECF 1-4 at 1.  For clarity, the Court discusses them collectively as the "[SF-VAMC] and its associated healthcare facilities."  *See* ECF 17-2 at 2.

[4] Uber Health is a wholly owned, healthcare-focused subsidiary of Uber Technologies, Inc.

[5] In addition to Uber Health, 28 Trans' complaint referenced the VA's engagement of transportation services provided by non-party Onward Health, Inc.  In its response brief, 28 Trans failed to respond to the government's representation that the VA's relationship with Onward Health predates the contract awarded to 28 Trans.  The Court raised this issue during oral argument.  Because 28 Trans failed to respond to the government's representation about the timing of the VA's relationship with Onward Health, the Court determines 28 Trans' bid protest arguments specific to Onward Health are waived.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1320–21 n.3 (Fed. Cir. 2005)) (explaining that "arguments not raised in the opening brief are waived"); *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (clarifying that "a party does not waive an

variety of federal procurement laws by de facto awarding Uber Health a series of sole source contracts outside of legal procurement avenues, and (2) in doing so, the VA breached its contract with 28 Trans by, among other things, taking rides that should have been assigned to 28 Trans and booking them with Uber Health instead.  The nine-count complaint pleads: bid protest (Count I); equitable adjustment (Count II); breach of contract (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); negligence and fraud (Count V); fraudulent inducement (Count VI); bad faith (Count VII); attorney's fees (Count VIII); and out-of-scope change (Count IX).  28 Trans seeks declaratory and injunctive relief as well as over $1.1 million in damages and attorney's fees.[6]

Pending before the Court is defendant's motion to dismiss Count I of the complaint—pled as a bid protest—pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC).  The government argues the VA's engagement of Uber Health and its use of the company's rideshare platform are not procurements or proposed procurements within this Court's bid protest jurisdiction and, regardless, 28 Trans lacks Article III and Tucker Act standing to challenge the VA's collaboration with Uber Health.  The Court heard oral argument on July 20, 2026.  For the reasons set forth below, defendant's partial motion to dismiss is granted.

## BACKGROUND[7]

Title 38, United States Code, Section 111 authorizes the VA Secretary to:

> pay the actual necessary expense of travel . . . , or in lieu thereof an allowance based upon mileage . . . , of any person to or from a Department facility or other place in connection with vocational rehabilitation, counseling required by the Secretary . . . , or for the purpose of examination, treatment, or care.

38 U.S.C. § 111(a).  Section 111A, in turn, sanctions the direct transport of eligible veterans by the VA and third-party volunteer organizations and drivers.  *Id.* § 111A(a)(1), (b)(1).  Pursuant to these statutes, the VHA developed a series of

---

argument based on what appears in its pleading; a party waives arguments based on what appears in its brief").

[6] During the initial scheduling conference conducted on February 11, 2026, the Court denied 28 Trans' motion for a preliminary injunction without prejudice.

[7] In recounting the background, the Court relies on facts drawn from documents referenced in and appended to the complaint, documents cited in and appended to the parties' briefs, and publicly available information.  *See Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 696 (2023) (in assessing an RCFC 12(b)(1) motion to dismiss, "[t]he court is not limited to the pleadings to assure itself of its jurisdiction; it may 'inquire into jurisdictional facts to confirm jurisdiction." (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991))).

transportation assistance programs that provide direct transport and travel reimbursement to eligible veterans. *See, e.g.*, *Metro. Area EMS Auth. v. Sec'y of Veterans Affs.*, 122 F.4th 1339, 1340–41 (Fed. Cir. 2024) (reviewing VA assistance program providing "noncontract ground and air ambulance transports" and noting that "[38 U.S.C.] § 111 . . . gives the Secretary discretionary authority to pay for certain travel expenses incurred by eligible beneficiaries for medical purposes like examination, treatment, or care").[8]

Through the Veteran Transportation Services program, for example, VA-paid drivers transport eligible veterans to and from their medical appointments in VA-owned (or leased) vehicles at no cost to the patient.[9]  This program accommodates both ambulatory and non-ambulatory patients, and the fleet of vehicles includes wheelchair vans and ambulances.  To request this service, patients can access the online portal (www.vetride.va.gov), download the VetRide Passenger mobile app, or call their VA medical facility's transportation representative.[10]  Eligible veterans can also request free rides from accredited Veterans Service Organizations through the VA's Volunteer Transportation Network, which is managed by the VA's Center for Development and Civic Engagement.[11]  This program is limited to ambulant patients, who are "able to get in and out of the vehicle without the driver's help."[12]

Another transportation assistance program, the Beneficiary Travel Program, allows the VA to pay for or reimburse eligible veterans for rides to and from medical appointments.  It is authorized by 38 C.F.R. § 70.1(a), which "provides a mechanism under 38 U.S.C. [§] 111 for the [VHA] to make payments for travel expenses incurred in the United States to help veterans and other persons obtain care or services from VHA."  Under this program, the VA provides financial assistance, typically through reimbursement, to patients who make their own travel arrangements using privately owned vehicles, common carriers (e.g., airplane, bus, taxi, train), or medically required special modes of transportation.  38 C.F.R. §§ 70.30(a)(1), (a)(4) (Beneficiary Travel Program payment principles); *id.* § 70.32(a) (outlining reimbursement and prior payment exceptions); *id.* § 70.32(b) ("Payment under this part will be made to the beneficiary, except that VA may make a beneficiary travel payment under this part to a person or organization other than the beneficiary upon satisfactory evidence that the person or organization actually provided or paid for the travel.").  Program

---

[8] *See also What are my transportation options for VA health appointments?*, U.S. DEP'T OF VETERANS AFFS. (Apr. 28, 2026), *available at* https://perma.cc/LUG2-Y5UU.

[9] The VA's authority to provide direct transportation services under § 111A(a)(1) is slated to sunset on September 30, 2026.  38 U.S.C. § 111A(a)(2).

[10] *See How to request rides to VA health appointments*, U.S. DEP'T OF VETERANS AFFS. (June 25, 2026), *available at* https://perma.cc/Z72B-2L4G.

[11] *See Accredited [Veterans Service Organizations] Search Results*, U.S. DEP'T OF VETERANS AFFS. *available at* https://perma.cc/XS2C-J7HB.

[12] *See* U.S. DEP'T OF VETERANS AFFS., *supra* note 10.

4

eligibility requires that a veteran meet one or more of the following conditions: VA disability rating of at least 30%; treatment for service-connected condition; patient is a VA pensioner; demonstrated financial need; or medical appointment "for a scheduled compensation and pension examination." *Id.* § 70.10.

On October 22, 2021, the Veterans Transportation Program partnered with the VHA Innovation Ecosystem[13] to engage Uber Health in a public-private collaboration under a Cooperative Research and Development Agreement (CRADA) "to offer rideshare as a supplemental transportation option for Veterans to get to and from their medical appointments."[14, 15]  ECF 1-11 at 3.  Touted as "the first collaboration of its kind where Uber Health's [HIPAA]-compliant platform was integrated into a healthcare system,"[16] the stated goals for the VHA–Uber Health Connect Initiative were to "reduce no-shows/missed appointments," "improve the veteran experience," and "achieve cost savings for VA Medical Centers."  *Id.*  Among the unique features of this program:

> Uber's HIPAA-compliant ride-sourcing platform allows clinics and VA Medical Centers to book rides directly for patients from a centralized dashboard. Patients can track the ride via text message or phone call, and the transportation is reimbursed by the . . . VA Medical Center . . . directly, so the Veteran does not have to [pay out of pocket,] submit a claim separately[, and await reimbursement].

---

[13] According to the VA's website:

> VHA Innovation Ecosystem (VHA IE) is the catalyst for enabling the discovery and spread of mission-driven health care innovation that exceeds expectations, restores hope, and builds trust within the Veteran community. VHA IE leverages the collective power of innovation champions from across VA, academia, non-profit and industry to operationalize innovation in the Nation's largest integrated health care system.

*See Changing Lives, Saving Lives: Fostering the Discovery and Spread of Innovative Veteran Health Care*, U.S. DEP'T OF VETERANS AFFS., *available at* https://perma.cc/LSV7-794P.

[14] A CRADA is "any agreement between one or more Federal laboratories and one or more non-Federal parties" with the primary goal of "conduct[ing] . . . specified research or development efforts which are consistent with the missions of the laboratory . . . ."  15 U.S.C. § 3710a(d)(1).

[15] The VA's interest in employing ridesharing as an option under the Beneficiary Travel Program apparently dates back to August 30, 2016, when the then-Acting Deputy Under Secretary for Health for Operations and Management reportedly penned a memorandum titled "Use of Ride Sharing Services under the Common Carrier Reimbursement within the [VHA]."  ECF 17-1 at 6.  That memorandum is not in the record presented, and the Court was not able to locate a public copy.

[16] "HIPAA" refers to the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.), enacted to protect patient privacy by safeguarding certain types of health information.  *See, e.g.,* 42 U.S.C. § 1320a-7c(a)(3)(B)(ii).

*VHA-Uber Health Connect (VUHC) Initiative*, U.S. DEP'T OF VETERANS AFFS. (last updated Aug. 1, 2024), *available at* https://perma.cc/W7SZ-ZSCA; *accord* ECF 1-11 at 9.

The VHA launched the rideshare transportation pilot program for ten VAMCs across two Veterans Integrated Service Networks (VISN) in January 2022, expanding to sixty-eight VAMCs across eleven VISNs—including the SF-VAMC—the following year.[17]  Between January 2022 and March 2024, the program reportedly provided over 263,000 rides to more than 38,000 patients at a total cost of $7.9 million.  The VA estimates that the program netted nearly $200 million in cost avoidance and cost savings, attributed to "missed appointments avoided" and "bed days saved" (i.e., avoided unnecessary inpatient admissions due to veteran's inability to secure transportation for outpatient treatments).  ECF 1-11 at 8.  Citing the success of the VHA–Uber Health Connect Initiative, after the CRADA expired on February 29, 2024, the VA launched an enterprise-wide rollout of the rideshare transportation program in May 2024.  Since then, the VA reportedly added Lyft, Inc. as a rideshare program option.

While developing that program, on July 13, 2023, the VA issued a solicitation to procure nonemergency special-mode ground transportation services for patients of the SF-VAMC and associated healthcare facilities.  Special mode of transportation vehicles include "an ambulance, ambulette, air ambulance, wheelchair van, or other mode of transportation specially designed to transport disabled persons . . . ." 38 C.F.R. § 70.2.  Exempted from this definition are "mode[s] of transportation not specifically designed to transport disabled persons, such as a bus, subway, taxi, train, or airplane[,]" as well as "modified, privately-owned vehicle[s], with special adaptive equipment and/or capable of transporting disabled persons . . . ."  *Id.*  Special-mode transporters must be trained to assist non-ambulatory patients with disabilities. These heightened requirements increase the cost of special-mode transportation over comparable common carriers.  Eligibility requirements for special mode of transportation reimbursement include eligibility under the Beneficiary Travel Program, medical need (e.g., non-ambulatory, requires physical assistance, mental health concerns), medically required travel, financial need, and either VHA pre-approval or medical emergency.  *Id.* § 70.4(d).[18]

---

[17] There are eighteen regional VISNs numbered 01, 02, 04–10, 12, 15–17, 19–23.  *See Veterans Integrated Service Networks*, U.S. DEP'T OF VETERANS AFFS. (July 15, 2026), *available at* https://perma.cc/KZM6-SJZZ (click "VISN List" dropdown).  "Phase 1 of the [VHA-Uber Health Connect] Initiative launched in VISNs 09 and 15. The pilot was expanded into Phase 2 in April 2023 to 9 new VISNs – 02, 04, 07, 08, 16, 17, 20, 21, and 22, at 58 new VAMCs."  ECF 1-11 at 6.  VISN 21 serves veterans in northern California and includes the SF-VAMC and affiliated medical facilities.  *Id.*

[18] In 2018, the VA Office of Inspector General conducted an audit and determined that special mode of transportation services were frequently "improperly authorized" because VAMC staff did not always adhere to the eligibility requirements.  DEP'T OF VETERANS AFFS. OFF. OF INSPECTOR GEN., REPORT NO. 15-00022-139, VETERANS HEALTH ADMINISTRATION: THE BENEFICIARY TRAVEL PROGRAM, SPECIAL

The solicitation included the following statements in the General Information and Scope of Work section of the performance work statement:

The contractor's responsibility shall cover non-emergent medical transportation services with VA San Francisco Health Care System. The [c]ontractor shall transport ambulatory and non-ambulatory beneficiaries on gurneys, stair chairs, litters, wheelchairs, secure car w/attendant, alternate safe beneficiary handling equipment, and/or Geri chairs to and from and vice-versa the [SF-VAMC and associated healthcare facilities], Veterans' residences, community nursing homes, or any other VA-authorized care facilities including the extended care facilities and the nine outlying community-based outpatient clinics . . . , 365 days a year, 24 hours a day to include Federal Holidays.

    . . . . Approximately 90% of transports will be to or from the SF[-VAMC].

. . . .

[] Historically, the SF[-VAMC] averages 975 round trips per month to and from the SF[-VAMC]. Ninety percent of trips are within a 40-mile radius of the SF[-VAMC]. Currently, there are 30-35 transport vehicles and 30-35 drivers utilized per day for this requirement. Please note, historical figures are provided for informational purposes only and are not guarantees for the level of work required under this contract. The demand may fluctuate significantly based on veteran and organizational needs.

ECF 1-4; ECF 1-5. The VA awarded a five-year Indefinite Delivery Indefinite Quantity (IDIQ) contract to 28 Trans on January 1, 2024.[19, 20] The IDIQ guaranteed minimum was $2,000 with a lifetime cap of $25 million.

In February 2024, and between June and August of 2024, 28 Trans reportedly booked over 1,000 rides per month, consistent with the historical data. By October of

---

MODE OF TRANSPORTATION ELIGIBILITY AND PAYMENT CONTROLS 4 (2018), *available at* https://perma.cc/7DN7-XVVH; *accord* ECF 17 at 14. Since addressing these issues, "improper beneficiary travel payments have been reduced from 25.6% in 2018 to 7.8% in 2025. . . . [As a result,] some special mode transportation companies saw a drop in their revenue." ECF 17 at 14–15 (citing ECF 17-1 at 6).

[19] Prior to awarding the long-term contract to 28 Trans, the VA engaged Owl Transportation and then Onward Health to provide these nonemergency special-mode transportation services.

[20] The VA contemporaneously awarded similar contracts for other VISNs to amicus curiae GovTranz, LLC and nonparty Integrated Trans Joint Venture LLC. Additionally, on December 20, 2024, the Battle Creek (Michigan) VAMC awarded GovTranz a contract to provide both special-mode and common carrier transportation services.

2024, however, the VA reportedly reduced the number of bookings by ninety percent. 28 Trans attributes this drastic reduction to the VA's April 2023 expansion and May 2024 enterprise-wide rollout of the VHA–Uber Health Connect Initiative. 28 Trans further alleges that the VA began assigning the more profitable and preferred trips to Uber Health, leaving 28 Trans to service less-profitable trips, including bookings rejected by Uber Health.

On June 24, 2025, 28 Trans submitted a certified request for equitable adjustment under the Contract Disputes Act, 41 U.S.C. §§ 7101–09, seeking nearly $900,000 in damages "for the VA's breach of contract, breach of the duty of good faith and fair dealing, negligence, fraud, fraudulent inducement and bad faith by improperly taking trips away from 28 Trans and giving those trips to Uber Health and Onward [Health] . . . and by using negligent estimates in its solicitation." ECF 17-3 at 2. 28 Trans submitted a second claim to the contracting officer on July 18, 2025, seeking an additional $300,000, citing an out-of-scope change to the contract. In a final decision dated December 9, 2025, the contracting officer denied both claims. 28 Trans commenced this action on February 5, 2026.

## DISCUSSION

I.     Legal Standard

This Court's statutorily prescribed jurisdiction to adjudicate claims and grant relief requires an affirmative waiver of sovereign immunity. *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 538 (2003) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). Accordingly, when the Court's authority to entertain a cause of action is challenged or otherwise called into question under RCFC 12(b)(1), the burden is on the plaintiff to "[establish] subject matter jurisdiction by a preponderance of the evidence." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969)). In evaluating the jurisdictional propriety of a claim, the Court accepts all uncontroverted factual allegations as true. *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (citing *Gibbs v. Buck*, 307 U.S. 66, 72 (1939)). Where, however, "the relevant factual allegations are in dispute, the Court may review jurisdictional facts beyond the pleadings or order jurisdictional discovery." *Crestview Clinical Lab'y, LLC v. United States*, 181 Fed. Cl. 1, 10 (2026) (citing *Fox Logistics & Constr. Co. v. United States*, 145 Fed. Cl. 236, 239 (2019)).

II.    Bid Protest Jurisdiction

The Tucker Act, from which this Court's bid protest jurisdiction arises, states, in relevant part:

> [T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction
> to render judgment on an action by an interested party objecting to a
> solicitation by a Federal agency for bids or proposals for a proposed

contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*.

28 U.S.C. § 1491(b)(1) (emphasis added). That provision gives the Court "'broad' authority 'over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement.'" *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 288 (2025) (quoting *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012)). But where a purported bid protest does not involve a procurement, the Court lacks jurisdiction to hear it. *Hymas v. United States*, 810 F.3d 1312, 1317 (Fed. Cir. 2016) ("[T]his provision speaks '*exclusively*' to 'procurement solicitations and contracts.'" (emphasis in original) (quoting *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010))). Accordingly, if the challenged arrangement between the VA and Uber Health is not a procurement (or a series of procurements), 28 Trans' bid protest claim must be dismissed for lack of subject-matter jurisdiction.

While "[t]he Tucker Act does not define the terms 'procurement' or 'proposed procurement'[,]" *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008), 41 U.S.C. § 111 defines "procurement" to encompass "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." This definition is the Court's starting point in determining whether a challenged arrangement is a procurement for purposes of the Court's bid protest jurisdiction. *See Distributed Sols.*, 539 F.3d at 1345–46 ("We conclude that it is appropriate to adopt this [statutory] definition to determine whether a 'procurement' [(actual or proposed)] has occurred pursuant to § 1491(b)." (citing 41 U.S.C. § 403(2) (currently codified at 41 U.S.C. § 111))).

The meaning of "procurement" is further clarified by the Federal Grant and Cooperative Agreement Act (FGCAA), Pub. L. No. 95-224, 92 Stat. 3 (1978) (codified at 31 U.S.C. §§ 6301–08). The FGCAA distinguishes between procurement contracts, which fall within the Court's bid protest jurisdiction, and grant agreements and cooperative agreements, both of which fall outside the Court's bid protest jurisdiction. *Hymas*, 810 F.3d at 1327–30. The "principal purpose" of procurement contracts is "to acquire . . . property or services *for the direct benefit or use of the United States Government* . . . ." 31 U.S.C. § 6303(1) (emphasis added). In contrast, the "principal purpose" of both grant agreements and cooperative agreements is the performance of a *public service* at the behest of the federal government and in its stead. *Id.* §§ 6304 (grant agreements), 6305 (cooperative agreements).[21]

---

[21] The principal difference between grant agreements and cooperative agreements is that the former do not contemplate "substantial involvement" between the government and its counterpart in

The government and Uber Health maintain that the challenged arrangement between the government and Uber Health is not a procurement contract (or a series of procurement contracts) because the rideshare services Uber Health provides are acquired and intended "for the direct benefit or use" of veterans—not the federal government. *Compare* ECF 1-11 at 3 (stating the purpose of the VHA–Uber Health Connect Initiative is "to offer rideshare as a supplemental transportation option for Veterans to get to and from their medical appointments"), *with Purpose Built Fams. Found., Inc. v. United States*, 167 Fed. Cl. 714, 718 (2023) ("[T]he [Supportive Services for Veterans Families] agreements were not for the direct benefit of the United States government. The applicable statutory and regulatory provisions provide that the purpose of the agreements is to facilitate supportive services to low-income veteran families." (first citing 38 U.S.C. § 2044(a); and then citing 38 C.F.R. § 62.1)), *and Bio-Medical Applications of Aquadilla, Inc. v. United States*, 119 Fed. Cl. 546, 566–67 (2014) ("[T]he dialysis services authorized by the VA . . . were for the direct benefit and use of individual veterans, not the VA."). The Court agrees.

That the VA realizes significant cost avoidance and cost savings as a consequence of the program's expansion and continued success does not alter this conclusion. *Cf. Hymas*, 810 F.3d at 1328 ("The [cooperative farming agreements] cannot be construed as procurement contracts because the agency did not intend to acquire farming 'services' for the 'direct benefit or use of the United States Government.'" (first quoting 31 U.S.C. § 6305(1); and then citing 41 U.S.C. § 111)). Nor does the fact that VAMC staff, rather than the veterans themselves, log into the Uber Health dashboard to order the rides. Regardless of who books the rides, the veteran remains the beneficiary. *Cf. 360Training.com, Inc. v. United States*, 104 Fed. Cl. 575, 580 (2012) (explaining that an agency acquires a direct benefit when it uses intermediary services to fulfill its charged obligations, but not when it "obtains services for a public purpose"); *Riegelsberger v. Air Evac EMS, Inc.*, 970 F.3d 1061, 1065 (8th Cir. 2020) ("It makes no difference . . . that medical providers, rather than the patients themselves, are the primary points of contract in arranging transportation. Just as a major airline can still be a common carrier if a passenger uses a travel agent to arrange transportation, health-care providers can provide the same service for their patients without affecting [the transporter's] common-carrier status." (citing *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 764 (4th Cir. 2018))).

In sum, 28 Trans' challenge to the VA's collaboration with Uber Health, under which Uber Health transports veterans to and from medical appointments in the same geographic area that 28 Trans services under its contract with the VHA, does not fall within this Court's bid protest jurisdiction. Accordingly, Count I must be dismissed. Whether the contested ridesharing program breached the VHA's contract with 28 Trans to provide nonemergency special-mode ground transportation services to patients of the SF-VAMC and its associated healthcare facilities, and whether

---

"carrying out the activity contemplated in the agreement," while the latter do. *Contrast* 31 U.S.C. § 6304(2), *with id.* § 6305(2).

28 Trans can prevail on any of its other remaining charges, the Court leaves for another day.[22]

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss Count I of plaintiff's complaint (bid protest) pursuant to RCFC 12(b)(1) (ECF 17) is granted.  In accordance with RCFC 12(a)(4)(A)(i), defendant shall file an answer to the operative complaint on or before **August 6, 2026**.  Defendant-intervenor and amici curiae are ordered to show cause why they should not be terminated from this action by filing respective notices to that effect on or before **August 3, 2026**.

It is so **ORDERED**.

Armando O. Bonilla
Judge

---

[22] In dismissing Count I as outside this Court's bid protest jurisdiction, the Court does not address the government's alternative contentions that 28 Trans lacks constitutional and statutory standing to assert this claim.  Because the Court finds it has no jurisdiction over Count I, its examination of the claim ends there.  *See Lea v. United States*, 126 Fed. Cl. 203, 211 (2016) (first citing *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002); and then citing *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993)).